I am aware that there are a lot of issues in this appeal, and I had proposed only to discuss three major topics with the panel, but of course I'll be happy to address any issues the panel would like to address. The three things I wanted to talk about are the trademark damages issue in our appeal, that is, our request that the jury's verdict of trademark damages be reinstated. The second thing I wanted to talk about was the trial judge's ruling as a matter of law that the patent was invalid. And the third item I wanted to touch on very briefly were some issues related to new arguments raised in particularly Roosh's reply brief that did not appear on their cross appeal in their opening brief. And to that end, let me start with the discussion of the trademark damages, and let me jump to what I think is the clearest and most direct issue here. And that is that the fact that the appellees here had not really dealt with the 39C problem that they have. There is no dispute here that everyone agreed that the trademark damages issues were going to be tried by a jury, and no one said anything about reserving those issues for the judge to be decided later and the jury's verdict to be advisory. And both the case law and the rule is very clear on the consequences of that. And with all due respect, the argument that the Lanham Act is somehow special doesn't get them very far. Well, I don't understand the judge to have said he was treating the verdict as advisory, so why are you bringing that up? The answer is he simply said, I'm going to ignore the verdict and I'm going to make up my own mind as to what the damages should be. Well, I don't think that's a fair characterization of what he did. He said he was relying on part of the Lanham Act to override. So he didn't treat it as advisory and he didn't say he could do anything. He just said he was following a specific provision of the Lanham Act. So isn't it your burden to show that he misapplied that provision? We submit that the Lanham Act statement about the court having the power to reset the damages is nothing more than a restatement of the court's power sitting in equity to do that. But even if it's correct that the Lanham Act is unlike Title VII, for example, which the judge is allowed in equity to decide certain monetary awards, but the 39C rule is clearly applied to that, even assuming the Lanham Act is different than other statutory schemes, there's no question that with respect to the common law trademark damages, there is no provision allowing the judge to come in and second-guess that damage award. There's no question under Dairy Queen that a trademark plaintiff seeking monetary damages is entitled under the Seventh Amendment to a jury trial on that issue. And there is no question under the Georgia law cases that we have cited that unjust enrichment is a species of damages under Georgia trademark law and that juries decide those under Georgia law. And given that there was a general verdict on trademark damages, it is presumed that either the Lanham Act or the state law applies. Judge Lynn? Doesn't the judge have some discretion? Not under Georgia law. If you read the Georgia cases, it is committed to the jury. And the common law trademark scheme that Georgia has adopted makes it a jury issue. Would that mean that no matter what dollar amount a jury came back with under Georgia common law of trademarks, that the judge would have zero power to make any adjustment? Absolutely not. Obviously, judges retain power under the Rule 50 standard if there is not substantial evidence to support it, and if a new trial order is made on a timely basis, the judge has that remedy as well. Neither one of those are applicable in this case. Neither of the appellees makes a Rule 50 argument in this appeal that there was insufficient evidence to support the jury's common law trademark finding, and neither defendant has any argument that there was any timely request made for a new trial. The final point I wanted to make on the trademark damages issues, and then I'll move on, is that going back to the Lanham Act issue, even if the Lanham Act gave the judge discretion to take away the unjust enrichment, the reasonable royalty that the jury awarded was plainly a species of actual damage under the applicable law and not one that the judge is allowed to, has discretion to reduce. He has discretion to enhance it but not reduce it. But if you're right about common law, we don't even need to reach this issue about whether... You're absolutely right, Your Honor. We don't even need to reach that. Let me turn to the patent validity issue because we have two rulings as a matter of law by the judge on best mode and written description issues, both of which are clearly traditionally questions of fact, and the judge's ruling as a matter of law requires all the factual inferences, of course, to be viewed in our favor. Speaking first with respect to the written description issue, we believe that the test is the one we cited in our brief, the Vasquez test, which is does the disclosure... Is your argument that the figure adequately shows full mental possession by the inventor of the length of the sheath? It does. The text specifically says how long should the sheath be. The text says to the usual extent of the bacteria. What is the usual extent of the bacteria? There are two things in the record, at least two things, that show that. The first is you have the drawing, which shows the bacteria, the black dots, only partway. Is that the heart of what the inventor discovered, the true length of the passage that is normally contaminated by bacteria as distinct from what was previously thought or assumed by others in the field? What was novel about this and what the key aspect of the invention was, was that the length of the insertion tip should be linked to the length of the normal extent of bacteria. It shouldn't be any farther and it shouldn't be any less. That hardly seems inventive, obviously, since the problem in the old art was that an excessively long sheath forced bacteria up ultimately toward the bladder and created infections. So, of course, anybody would be able to quickly see that you don't want the sheath to be too long. But I don't think you're answering my question. Is the real innovation or discovery here the correct measurement of the zone that does normally have bacteria or not? With all respect, I believe the answer to that question is no. It may be worth reviewing the sequence in the prosecution history. So he didn't discover the true length of the bacteria? No, that was known in the art. Mayo and Hinman says that, based on their studies, the extent of bacteria extends to the high-pressure zone, which they say is 1.5 centimeters plus or minus 3 millimeters. I thought there was some learning in the prior art that suggested it was closer to 4 millimeters. There's no question that there were studies previous to Mayo and Hinman, much earlier. In fact, Hinman was a co-author of one of those studies with Dr. Cox that suggested that there was bacteria in very small amounts farther up into the urethra. But the newer old art said 1.5. And the newer old art also pointed out that the reason why Cox and Hinman had found this bacteria farther up was due to the errors created in the way they measured the extent of bacteria. And so we believe, one of Erdner's skills in the art, looking at the drawings, looking at the catheter drawings, the text, and knowing the state of the art as of 1979, would understand that Dr. O'Neill was in possession of the idea. So your bottom line is these two validity issues needed a trial, not a summary judgment? Absolutely. They had arguments that Cox meant something else. The jury should have been the one to sort that out. And all we are asking for is reversal of the summary judgment and a remand for trial on that issue. Has this case been in settlement discussions? We have had some settlement discussions. Unfortunately, there has not been any significant ability to bridge. Obviously, if we were persuaded by your argument and we send it back for trial on issues that were disposed of by summary judgment, there will be a trial, then there will be more post-trial motions, then there will be another appeal, and then we'll all be back here and maybe there will be another remand, and it will just go on and on and on. It seems like it's not in the interest of the parties to have this go on endlessly, but that's only my uninformed view. I don't know what is truly in the interest of the parties. I suppose you and Mr. West and Mr. Quigley do. It just seems odd that it's going on and on and on to me. It is frustrating. It's been going on for a long time, and I suspect that once we have your all's decision on this case, we'll maybe be able to take another one. You only have about 30 seconds left if you are going to keep your rebuttal time, so maybe you need to get to the third point. Very briefly, with respect to their reply brief, on their cross-appeal, they have 11 pages of their brief devoted to that, and they raise three substantive arguments. Number one, there was no secondary meaning before the license to MMG. Number two, because there was no secondary meaning prior to the license, there was nothing to license, and therefore nothing inured to the benefit of GoMedical. And three, they make a naked license argument. There are two sentences within that, without any citations to any cases or the record, suggesting that— Are you arguing your motion, or are you arguing the merits of— I'm arguing the merits of why their cross-appeal should be denied. Okay. And one of the problems that we have is these new arguments came in, and we can't show you in the record why they're wrong or show you the case law why they're wrong. I'll pick just one example, the generic argument. Well, if you're asking for—if you're suggesting that you should be given an opportunity to file some kind of further brief, a reply to the reply, there is a way to do that by motion. I'm sure you're familiar with it. So if that's what's needed, I would think you would act accordingly. Well, that's fine. The only request I would make of the Court is to look carefully at what arguments were generally raised in the opening brief and believe those are the only ones properly before the Court. And with that, I'll reserve the balance of my time. Thank you, Mr. Flynn. Mr. West. Good morning. May it please the Court? Mr. West, am I correct that you and Mr. Quigley are splitting the time? Correct. We have different issues. In what fashion? Minute allocation of time? Minutes, yes. I'm going to start with nine, reserve one. He has four, reserving one. Four and one. Thank you. Go ahead, please. Well, just to go over the points that Mr. Flynn raised, there is no Rule 39C problem. Your Honor is correct that the district judge just didn't address that there was no advisory jury issue here. What about the absence of discretion under Georgia law for the common law? Glad you raised that. There was no Georgia common law here. Just to make certain of that, I reread Mr. Flynn's closing argument to the jury and the judge's instructions to the jury in the jury verdict. There is absolutely nothing in any of those about Georgia state law. The jury didn't decide anything under Georgia state law. They only decided it under the Lanham Act. How do we know that? Does the verdict form specify Lanham Act in a way that would support the conclusion that it's Lanham and only Lanham? No, the jury verdict did not, but the jury verdict was silent as to Georgia law. There was nothing in the verdict about Georgia law. The judge's instructions to the jury four times cited the Lanham Act but never Georgia state law. Further, Mr. Flynn never argued to the jury anything about Georgia state law. So consequently, there is no basis in the record to assume gratuitously that the jury decided anything about Georgia state law. With respect to common law, it's true that they claim a common law trademark, but that comes under the aegis of section 43A of the Lanham Act, which covers common law trademarks. It creates a right of action for common law trademarks, and that's what they were pursuing in this case. 43A is 15 U.S.C. 1125, and the damages they sought were under section 1117A of the Lanham Act, and that's the- What about his complaint that the judge wrongly viewed royalty not as an aspect or measure of actual damage, but as if it were defendants' ill-gotten profits? Well, that's the way their expert did it. Mr. Kennedy was their expert, and if you look at the record, appendix pages A1617 through 1642- I suppose your position is that whatever was used for the multiplication doesn't change the proper legal category, and you would say it's actual damages. No, I say it's not actual damages. Pardon me, I'm saying- It was a calculation based on profit, because their expert took what he calculated- incorrectly calculated, incidentally- but calculated to be the defendant's excess profits, and then he took a share of that and arbitrarily assigned it to the trademark and came up with a 3% trademark royalty. It was totally based on profits, specifically excess profits. There was nothing else involved. There was no actual damages because there was absolutely no evidence of diverted sales or any pecuniary loss to the plaintiffs as a result of trademark infringement. I think we've cited the Band-Aid v. Al Bolser case for general propositions about Section 1117A, but I think it's also very instructive on the notion of what constitutes actual damages in a trademark case. There were no actual damages here. The reasonable royalty was a figure plucked out of the air, 3%, but it was based on excess profits. You only have to look at six pages of the record to see that, A1617 through 1642. 1617 through- 1642. That's the testimony of their expert, Mr. Kennedy. It explains totally how he got to where he got. Mr. West, would you comment briefly on the applicability of the Lear Doctrine? Applicability? That doesn't- In this case. My client in Med was never in any license agreement, and consequently it doesn't apply to my client. I think that Mr. Quigley may wish to address that, Your Honor. All right. I apologize for not answering the question, but I think I have a good reason. Okay, I'm going to move to the patent issue. It's always the problem when you divide up an argument like this. I know. Mr. Quigley said here- I mean, Mr. Flynn said here, and he said in his reply brief, I noticed, that he takes this Mayo and Hinman article and wants to say, well, that's what the art knew. In fact, he has a statement. He says, well, the art accepted this. There is no evidence that he cited, and there is no evidence in this record, that the art accepted Mayo and Hinman's statement about one and a half centimeters. In fact, the inventor, Mr. O'Neill, Dr. O'Neill, testified that there were a variety of opinions, and nobody in the art knew exactly what the situation was, and that if any authority in the field was going to be accepted, it was Dr. Cox, not Mayo and Hinman. And that evidence is clearly in the record. I can give you a citation to that, too, I hope. Well, I don't see it here, but I believe we cited it in our brief. But on that issue, though, of the patent, Dr. O'Neill did testify very eloquently as to why he avoided putting the 1.5 centimeter limitation, which he already knew, into his patent. And he said he just didn't want to be limited by it. But that's not an excuse for not disclosing the invention that he later claimed. So, for that reason, if you look at pages... What do you take to be the invention? Big what? What do you take to be the invention? What do I think? What is the invention? What did he invent? What he invented was a catheter with a sheath, and that the sheath would go in only a certain distance, which was either 1.5 centimeters or to the region of maximum pressure within the urethra. And nothing about either of those subjects was in the original application, but was in the article that he published that became the prior art to his later CIP application. And he agrees that if he doesn't get the earlier date, his own article sinks his patentability. I don't think there's any dispute about that. The whole argument is whether the 1979 application supports the limitations, which became crucial to the granting of the patent. All right. You have just about a minute left that you still have to reserve. I just wanted to give you the citations where he talked about how this limitation of 1.5 centimeters was critical. That's at appendix page 8059 through 8062. And also he admitted that he had those limitations as a best mode, but he avoided putting those dimensions into his 1979 application. That's at page 8, pardon me, A8064. He may not have been aware, as all good patent lawyers are, that you're not limited to the scope of the preferred embodiment if you have broader claim terms. I don't know what he was aware of, but I think that he made it very clear in his testimony that he deliberately didn't put those dimensions into the patent. And unfortunately that, as you say, sinks his ship. All right. Unless there are some further questions, I will reserve the rest of my time. Thank you. Mr. Quigley. Good morning, gentlemen. I wanted to address Issue 2 on the cross-appeal, but I think before going into that discussion I would invite Judge Lynn's question on the Lear Doctrine. Thank you. Judge, basically we have argued that Lear is pretty solid in this case going forward. That is, from the date that the defendant said, we think the patent's invalid and we're not going to pay you. Now, it's true that we argued in our brief that the Lear Doctrine ought to bar the contract deficiency that represented the payments from 1992 to 1999. The plaintiff sought additional claims for that period. To be honest with you, that leads into my best argument. I don't believe that my client can convince this Court, in light of the Shell Oil case, that Lear would go back and bar past claims that weren't paid. And that's why I want to urge upon the Court that the best defense of the defendants in this case, and our strongest case to reverse the judges sustaining the jury's verdict for the $4,700,000, is the fact that the 1997 amendment is not ambiguous. The word convoluted is certainly applicable to that document. But if you look at that document... It certainly seems ambiguous on its face because there's a potential discrepancy between 7% of sales and 50% of promise. Well, Your Honor, the first thing I would point to is if you look at the record, A0050, which is the first page of the amendment, 1997 amendment, it says, whereas the parties to the original agreement have agreed to amend and modify the terms of the original agreement, and this is the emphasis part, to conform to present practices and to clarify certain terms and clauses in the original agreement. So the document was definitely a cleanup. And the present practice was paying 7% of gross sales and not 50% of net profits. So your point is that the curing clause in the revised contract precludes any additional compensation from preceding 1997 for all the earlier years. It does, Your Honor. I'm reading directly. And that's so clear that it's a matter of law, that no jury should be allowed to find otherwise. It is, Your Honor. But am I correct that you're abandoning your Lear argument made in your brief? Your Honor, I don't want to throw it in the towel, but I don't want to waste this Court's time trying to overturn a considerable history of cases which originated with this Court's decision. I'll revise it to say you're deemphasizing your Lear argument but not abandoning it. I think that's correct, Your Honor. But it says in 4A, which is the only convoluted paragraph that could have any ambiguity, any amounts other than the aforementioned 7% shall be due go medical USA only upon mutual agreement of both parties in writing after negotiation. And that's pretty clear. And then, just so I don't omit mentioning it, indeed a substantial portion of the 4,000,007 is covered by the clause that says the parties agree that go medical USA has been fully paid all monies due go medical under the original agreement prior to the effective date of this amendment. You're down to half a minute on your rebuttal, Your Honor. I'll retreat, Your Honor. Thank you very much. Thank you very much, Mr. Quigley. Mr. Flynn. You have about four minutes remaining, Mr. Flynn. Hopefully I won't need to use all four. I wanted to make just a couple of points. The first was you asked Mr. West what about the common law trademark issue. And you heard from him, oh, common law trademark issue was never in the case when it got to the jury. It was only Lanham Act. Well, if that sounds like a new theory, it is. Here's what he said on page 43 of his principal brief. The jury instructions reference claims for both trademark infringement and unfair competition in violation of the Lanham Act and common law trademark infringement. And that wasn't just an accident. One of the things the jury was asked to consider were punitive damages. The only way punitive damages could be allowed in this case, because they're not allowed under the Lanham Act, the only claim remaining in the case that would support punitive damages was common law trademark infringement, which Georgia law allows punitive damages. And if that wasn't enough, the pretrial order, which defines the issues that are going to be tried, and this is at page A00210, number 6 reads, whether defendant's actions constitute common law trademark infringement. No question it was in the case. Did you ask for a charge to explain Georgia law? Because the issues that the jury had to try were the same under Georgia law, or the parties agreed would be the same under Lanham Act and Georgia common law, because there weren't different standards under the things the jury had to decide. They were not distinguished. And when you read the instructions, the judge simply said trademark infringement. And there was no dispute between the parties at the time on that issue. Was there something in the record that made it clear that your claim for punitive damages was tied to Georgia law? Absolutely. When you read the arguments on the jury instructions, the judge said at one point, and this is in the record that you have, the judge said, well, why are punitive damages in this case still? Because didn't I throw out the tort claim that you had involving Mr. Powell? And I said, yes, you did throw that out, Your Honor, but the common law trademark claims allow us to keep punitive damages in the case. Unquestionably there. But there was no specific reference to Georgia law? In that discussion, absolutely. We said the reason why you're instructing the jury on punitive damages, Your Honor, is because one of our claims is for common law trademark infringement. Thank you. Thank you, Mr. Flynn. Mr. West. One minute. Well, I can really only reiterate the points I tried to make before. No need to reiterate. You were perfectly clear the first time. Just to make it clear, when you're talking about a common law trademark, that falls under 43A of the Lanham Act. That has to do with trademarks that are common law, i.e. not registered. That's where the common law trademark comes in. Again, there was absolutely nothing about Georgia law that the jury heard either from the judge in his charge or an argument from Mr. Flynn. What about the punitive damage? I can't answer that because there's no disagreement, Your Honor, that the punitive damages were only against MMG. There was no punitive damages against my client, INMED. So I can't address that. That would be Mr. Quigley's argument. But there's no question that the unjust enrichment damages that were awarded against INMED were, quote, based on profits and therefore fell under Section 1117 of the Lanham Act. One point that I hope the Court will indulge me, in Mr. Flynn's reply to my opposition to his motion to strike portions of my reply brief, he said that they had not argued in their brief, which was what we were responding to, that MMG's use of the word O'Neill gave rise to secondary meaning. And, in fact, at page 12 of his yellow brief, that's exactly what he said. That's what we were responding to. Thank you. All right. Thank you, Mr. West. Mr. Quigley, you have half a minute. I thought he used half of it. No, he didn't. All right. I stand corrected. You have a full minute. I'm sorry. I want to make sure I stand on it. Judge Lind, the punitive damages issue, for the second time by default you get to answer one of my questions. Your Honor, the first answer to the punitive damages issue is that under Georgia law you can't have punitive damages for a contractual breach. So there has to be a tort. The tort here was alleged infringement, whether it's under common law, federal, or Georgia law, or whatever. And the fact is, the best answer is there's no trademark in this case. So there cannot be any infringement. The other thing that is relevant to the punitive damage issue... There's no trademark because the testimony of Dr. O'Neill about secondary meaning has to be viewed as insufficient as a matter of law, in your opinion? Your Honor, as a matter of... Yes, there's no secondary meaning. There was no basis for any language. But he said there was. So you have to be saying that his testimony doesn't make it so. That's right. And I think, just like he testified under cross-examination, that at the time he signed the license agreement, he didn't even have the rights to the O'Neill name. So how did he license it to anyone? And it had no secondary meaning separate and apart from MMG O'Neill. The next thing is, as the trial judge found, this was an honest disagreement about this trademark infringement. These claims to this name and whether it was good or bad or otherwise. So the judge found no willful or wanton conduct in disregard of the consequences. So if you don't have a trademark and also you don't have willful conduct, you don't have a punitive damage claim. All right. Thank you, sir. Time has expired. We thank all three counsel. We'll take the case under advisement. Thank you.